IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

LEIGH ANN YOUNGBLOOD-WEST,          *

    Plaintiff,                  *

vs.                                 *

                                       CASE NO. 4:18-CV-83 (CDL)

AFLAC INCORPORATED, DANIEL P.       *
AMOS, WILLIAM LAFAYETTE AMOS,
JR., CECIL CHEVES, & SAMUEL W.      *
OATES,
                                 *

    Defendants.

O R D E R  (REDACTED PUBLIC COPY)

    Plaintiff's lawyer, Dimitry Joffe, has not fared well in this Court.  In addition to adverse rulings in the present action, the undersigned recently dismissed a shareholder derivative action filed by Mr. Joffe against Aflac[1] and several of its board members; and in a separate action, the undersigned, over Mr. Joffe's objections, ordered the arbitration of claims asserted by Mr. Joffe on behalf of Aflac sales associates.  Rather than acknowledge the possibility that his record thus far may be due to the weakness of his legal arguments, Mr. Joffe blames his lackluster performance on the alleged personal bias of the undersigned.  Like the Little League parent who blasts the umpire when his eleven-year old takes a third strike, Mr. Joffe wants another judge.  Just as that umpire

_____

[1] In this Order, the Court refers to any of the various companies related to AFLAC Incorporated generally as "Aflac."

1

must remain in the game, so too must this judge. To ensure the impartial administration of justice, we do not permit disgruntled attorneys to manipulate the system and shop for a new judge when things do not go their way. As explained in the remainder of this Order, Plaintiff's motion to recuse (ECF No. 69) is frivolous and therefore denied.

PLAINTIFF'S GROUNDS FOR RECUSAL

Plaintiff seeks to recuse the undersigned pursuant to 28 U.S.C. § 144 and § 455. She has filed an affidavit describing why she believes the undersigned has a personal bias or prejudice against her and in favor of the Defendants. Her concerns fall into four categories: (1) she alleges that the affiliation of the undersigned and the Amos Defendants with the so-called "Fish House Gang" creates the appearance of partiality; (2) she maintains that the undersigned's family relationships with employees of AFLAC, specifically William Donald Land, Jr., require the undersigned's recusal; (3) she argues that the undersigned's spouse has an interest that could be substantially affected by the outcome of this action; and (4) she points to various rulings of the undersigned in support of her claim of actual bias.

DISQUALIFICATION STANDARDS

Section 144 requires disqualification if a judge has personal bias or prejudice either against a party or in favor of an adverse party. 28 U.S.C. § 144. To initiate a motion for disqualification pursuant to § 144, the party must file a "timely and sufficient" affidavit stating the facts and reasons for the party's belief that bias or prejudice exists. *Id.* Plaintiff has filed an affidavit purporting to satisfy section 144. *See* Pl.'s Mot. for Recusal Ex. 5, Pl.'s Aff., ECF No. 69-5 ["Pl.'s Aff."]. Section 144 contemplates initial screening of a party's recusal affidavit in order to prevent manipulation of the judicial system by disgruntled litigants. *See Davis v. Bd. of Sch. Comm'rs of Mobile Cty.,* 517 F.2d 1044, 1051 (5th Cir. 1975) ("Once the motion is filed under § 144, the judge must pass on the legal sufficiency of the affidavit . . .")[2]. "Legal sufficiency is determined as a question of law on the basis [of] whether the affidavit sets out facts and reasons for the party's belief that the judge has a personal bias and prejudice against the party or in favor of the adverse party." *Parrish v. Bd. of Comm'rs of Ala. State Bar,* 524 F.2d 98, 100 (5th Cir. 1975) (en banc).[3] A three part test assists

---

[2] In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[3] *See supra* note 2.

the Court in determining the sufficiency of an affidavit filed pursuant to section 144: "1. The facts must be material and stated with particularity; 2. The facts must be such that, if true they would convince a reasonable man that a bias exists; [and] 3. The facts must show the bias is personal, as opposed to judicial, in nature." *Id.* (quoting *United States v. Thompson,* 483 F.2d 527, 528 (3d Cir. 1973)). "[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States,* 510 U.S. 540, 555 (1994).

Section 455 is similar to § 144 except that no affidavit is required to support a motion for recusal pursuant to section 455. *Phillips v. Joint Legislative Comm. On Performance and Expenditure Review,* 637 F.2d 1014, 1019 (5th Cir. 1981). Like § 144, § 455 requires disqualification if the judge's impartiality "might reasonably be questioned" or if he has a personal bias or prejudice for or against a party. 28 U.S.C. § 455(a)-(b)(1). A judge must also disqualify himself if "[h]e knows that he . . . or his spouse . . . has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding." 28 U.S.C. § 455(b)(4). To determine whether an interest could be "substantially affected," the judge must evaluate "two variables: the remoteness of the interest and its extent or degree." *In re Moody,* 755 F.3d 891, 897 (11th Cir. 2014). Finally, a judge must

4

recuse if "a person within the third degree of relationship to [him] . . . [i]s a party to the proceeding, or an officer, director, or trustee of a party; [i]s acting as a lawyer in the proceeding; [or] [i]s known by the judge to have an interest that could be substantially affected by the outcome of the proceeding." *Id.* at § 455(b)(5)(i)-(iii).

As explained in the remainder of this Order, Plaintiff's affidavit and motion fail to allege sufficient facts to demonstrate bias or prejudice; they also do not show that the impartiality of the undersigned might reasonably be questioned.

FACTUAL AND PROCEDURAL BACKGROUND

Before addressing Plaintiff's specific accusations, the Court finds it helpful to describe what happened prior to Plaintiff's motion to recuse in order to provide context to her allegations of bias. Plaintiff's counsel, Mr. Joffe, has been involved in three other related actions in this Court. The following discussion describes those actions and the events that led to them.

I.   Claims By Disgruntled Sales Associates and Shareholders

AFLAC Incorporated is a holding company that provides supplemental insurance products through its wholly owned subsidiary American Family Life Assurance Company of Columbus (collectively referred to in this order as "Aflac"). In addition

to the Plaintiff in this action, Mr. Joffe represents several disgruntled former employees and current shareholders of Aflac. He asserted derivative claims on behalf of three Aflac shareholders against officers and directors of Aflac. *See Conroy v. Amos*, No. 4:18-CV-33, 2018 WL 4208855 (M.D. Ga. Aug. 31, 2018)(hereinafter referred to as "the derivative action"). This action was dismissed by the undersigned. *See id.* Mr. Joffe also has asserted putative class action claims on behalf of seven present and former disgruntled Aflac sales associates. *See Am. Family Life Assurance Co. of Columbus v. Hubbard*, No. 4:17-CV-246, 2018 WL 283254 (M.D. Ga. Jan. 3, 2018)(hereinafter referred to as "the arbitration action"). The undersigned ordered Mr. Joffe to submit these claims to arbitration. *See id.* The following discussion describes the relationship between the derivative action, the arbitration action and the present action.

In December 2016, Mr. Joffe sent a notice on behalf of several former Aflac sales associates to Aflac's chief executive officer and the chairman of its board, Dan Amos, to Aflac's president and former board member, Paul Amos II, and to Aflac's general counsel. *Conroy,* 2018 WL 4208855, at *3. The notice made the following specific accusations: (1) Aflac engaged in fraudulent recruiting by promising potential sales associates they could make more money than was actually possible; (2) Aflac manipulated its key operational metrics to artificially inflate its potential earnings

and growth; (3) Aflac engaged in fraudulent underwriting through various means designed to artificially inflate its earnings; (4) Aflac engaged in fraudulent accounting practices by improperly extending revenue reporting periods; and (5) Aflac regional sales coordinators and market coordinators stole sales associates' commissions (collectively, the "Fraud Allegations"). *Id.* The associates also alleged that Aflac retaliated against them for informing management of the Fraud Allegations. *Id.* They asked Aflac to waive their arbitration agreements and allow them to pursue related claims against Aflac in court. *Id.*

In-house counsel for Aflac informed Mr. Joffe by letter that Aflac would investigate the Fraud Allegations. *Id.* Less than a month later, Aflac informed him that that it unequivocally denied the Fraud Allegations and demanded that the associates individually submit their disputes to arbitration. *Id.* Ignoring the arbitration agreements, Joffe sent Aflac a draft putative class action complaint asserting several claims against Aflac on behalf of Aflac sales associates and demanded that Aflac settle the claims. *Hubbard,* 2018 WL 283254, at *2. Aflac anticipatorily filed a petition in state court for an order compelling arbitration according to the sales associates' arbitration agreements. *Id.* at *1. The sales associates removed the case to this Court, and the undersigned found that the arbitration agreements were enforceable

and ordered the associates to submit their claims to arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*. *Id*.

Three months after Aflac denied the Fraud Allegations and demanded that the sales associates submit their claims to arbitration, Mr. Joffe sent a notice to Aflac's outside directors that was similar to the one he had previously sent to Dan and Paul Amos and Aflac's general counsel. *Conroy,* 2018 WL 4208855, at *3. One of the outside directors, on behalf of all of the outside directors, informed Joffe that they were already aware of the Fraud Allegations and had been informed of management's due diligence efforts. *Id.* The response letter also informed Mr. Joffe that Aflac had retained outside counsel to represent Aflac in relation to the dispute notice and directed him to address future correspondence to the outside counsel. *Id.* Mr. Joffe alleged that the defendants in the derivative action breached their fiduciary duties to Aflac by failing to adequately investigate the Fraud Allegations and by failing to implement controls to detect and prevent the alleged wrongful conduct. *Id.*

Before Mr. Joffe notified Alfac's outside directors of his clients' Fraud Allegations, Aflac published its FY2016 Annual Report. *Id.* at *4. In that report, Aflac allegedly failed to disclose the Fraud Allegations. *Id.* In March 2017, Aflac published its 2017 proxy solicitation to shareholders, which

assured shareholders that Aflac was in good hands with the current board members and recommended that shareholders reelect Aflac's directors to the board. *Id.* The proxy likewise allegedly made no disclosure of the Fraud Allegations. *Id.* On May 1, 2017, shareholders reelected Alfac's board members. *Id.* Mr. Joffe claimed that the FY2016 Annual Report and 2017 proxy were false and misleading in violation of 15 U.S.C. §§ 78j and 78n and SEC Rules 10b-5 and 14a-9 because they failed to disclose his client's Fraud Allegations and their potential effect on Aflac's operations. *Id.*

In June 2017, Paul Amos II notified Aflac's board that he would be resigning as a director of Aflac and as president of Aflac on July 1, 2017. *Id.* Paul Amos allegedly sold over 200,000 of his Aflac shares a few days later. *Id.* Mr. Joffe alleged that Paul Amos committed insider trading under 15 U.S.C. § 78t-1 because he traded on material, nonpublic information—namely, knowledge of the sales associates' Fraud Allegations. *Id.* Pursuant to its director-authorized stock repurchase program, Aflac purchased some of its own shares the day after Paul Amos's stock sale. *Id.* Mr. Joffe claims that Aflac paid a higher price for its shares than it otherwise would have paid had it been aware the prices were inflated. *Id.*

Shortly after Paul Amos's stock sale, Mr. Joffe sent Aflac's counsel his first formal demand ("First Demand"). *Id.* This demand alleged that Paul Amos committed insider trading and breached his fiduciary duty to AFLAC when he sold his stock. *Id.* It demanded that Aflac bring a lawsuit against Paul Amos for disgorgement and other damages. *Id.* In response, Aflac's board created a special litigation committee composed of three outside directors (the "SLC") to investigate the claims against Paul Amos and respond to Mr. Joffe's First Demand. *Id.* The SLC eventually determined that pursuing the claims was not in Aflac's best interest and rejected Mr. Joffe's demand. *Id.*

Mr. Joffe then circulated a draft complaint to Aflac's outside counsel that named Dan Amos, Paul Amos II, and four Aflac directors as defendants ("Second Demand"). *Id.* In the Second Demand, Mr. Joffe asserted breach of fiduciary duty claims, securities and proxy fraud claims, an unjust enrichment claim against Paul Amos arising from his stock sale, and the insider trading claim against Paul Amos that the SLC had previously rejected. *Id.* Because the draft complaint presented the breach of fiduciary duty, unjust enrichment, and securities and proxy fraud claims to the SLC for the first time, the SLC considered the draft complaint to be a second formal demand and undertook to investigate. *Id.*

Before the SLC had formally responded to his Second Demand, Mr. Joffe filed his shareholder derivative action in the Southern District of New York. *Id.* at *5. Less than a month later, *The Intercept* published an online article detailing Aflac's conduct alleged in Mr. Joffe's client's complaint, including the Fraud Allegations. *Id.* The next day, Aflac's stock dropped 7.5%. *Id.* During the trading day, Aflac published a press release denying the allegations in the article and informing the market that Mr. Joffe's allegations were meritless. *Id.* Aflac then filed a Form 8-K with the SEC that reiterated Aflac's position, and it published the report the SLC generated in its investigation of Mr. Joffe's First Demand. *Id.*

Mr. Joffe subsequently amended his derivative action to include additional claims of securities fraud for alleged false misstatements and omissions in the press release and the Form 8-K ("Third Demand"). *Id.* The SLC considered the amended complaint to be a third formal demand and acted accordingly. *Id.* About a week later, the SLC issued its second report, rejecting Plaintiffs' Second Demand. *Id.* The New York derivative action was then transferred to this Court. *Id.*

Defendants in the derivative action moved to dismiss Mr. Joffe's amended complaint pursuant to O.C.G.A. § 14-2-744, which allows a corporate defendant to seek termination of a derivative

suit based upon the recommendation of a committee of the corporation's independent board members. *Id.* The undersigned granted the motion to dismiss on August 31, 2018 in a thirty page written order. *Id.*

Mr. Joffe did not file a motion to recuse the undersigned in the derivative action. But he did drop a footnote in a brief inviting the undersigned to evaluate whether he should recuse due to the undersigned's affiliation with the so-called Fish House Gang and family relationships. *Id.* at *1. Although no motion to recuse was filed, the undersigned found it necessary to clear up any suggestion of bias and explained in the written order granting Defendant's motion to dismiss why no basis existed for the undersigned's disqualification. *Id.* at *1-2. Three weeks after the undersigned dismissed Mr. Joffe's shareholder derivative action, Mr. Joffe filed his motion for recusal in the present action. Pl.'s Mot. for Recusal, *Youngblood-West v. Amos*, No. 4:18-CV-83 (M.D. Ga. Filed May 1, 2018), ECF No. 69.

## II. Claims Arising from Dr. William Amos's Alleged ████ ████ and Ms. Youngblood-West's Alleged ████ ████ ██ █

As previously noted, the undersigned ordered Mr. Joffe to arbitrate the sales associates' claims instead of pursue a putative class action. *Hubbard,* No. 4:17-cv-246, 2018 WL 283254 (M.D. Ga. January 3, 2018). The undersigned denied Mr. Joffe's motion to

reconsider that order on January 25, 2018.  Order, *Hubbard,* 2018 WL 283254, ECF No. 23.  Less than sixty days after the undersigned denied that motion, Mr. Joffe allegedly sent a letter to Aflac's private counsel stating that ███████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████ █████ ████ ████ ███ ███ ████ ████ ████ ████ ████ ██████ ████████ ████ ███ ████ ████ ████ ████ ██████ ███████ ██ ███ █████████ ████████ █████████ Compl. Ex. C, Letter from Dimitry Joffe to Lisa Cassilly and Mary Gill 1 (Mar. 16, 2018), ECF No. 2-3 ("Demand Letter"), *Amos v. Youngblood-West*, No. 4:18-CV-68 (M.D. Ga. Filed Apr. 16, 2018).  Mr. Joffe further alleged that ████ ████ ████ ████ ████ ████ ████ ████



*Id.* Mr. Joffe informed Aflac's counsel in the letter that he represented Leigh Ann Youngblood-West, ████ ████ ███████ ████ ████ ████ ████ ████ ████ ████ ████ ████ *Id.* at 2.  Mr. Joffe

acknowledged in the letter that Ms. Youngblood-West had entered into a "global settlement" ▆ ▆▆ ▆▆▆ ▆ ▆ ▆▆▆ ▆▆▆ ▆▆ ▆▆and that she was represented at that time by attorney Samuel Oates for whom she worked as a legal secretary at the time. *Id.* at 4.  Mr. Joffe failed to mention in his letter that Ms. Youngblood-West retained other counsel in 1993 to pursue additional claims ▆▆▆ ▆▆ ▆▆▆ ▆▆ ▆▆▆ ▆▆▆ ▆▆▆ ▆▆ ▆▆ ▆▆▆▆ ▆. Compl. ¶ 155, *Youngblood-West v. Amos*, No. 4:18-CV-83 (M.D. Ga. Filed May 1, 2018), ECF No. 26.  She signed releases that included confidentiality agreements when she settled her claims in 1992 and in 1993.  *Id.* Ex. C, 1993 Settlement Agreement, ECF No. 26-3; Am. Compl. Ex. B, 1992 Settlement Agreement, ECF No. 26-2.

According to Mr. Joffe's letter, ▆▆ ▆▆▆▆



Mr. Joffe concludes his letter by informing Aflac's counsel that he was retained by Ms. Youngblood-West in 2018 "to prosecute her ██████ ████ ████████ claims against Aflac" and that she had instructed him "to ████████ ████████ ██ █ ████████ ████████ ████████ ████████ ████████ ████████ ████████ ████████ ████████ ████████ ████████ ████████ ████████ ████████ ████████ ████████ ████████ ████████ ████████ ████████ ████████ ████████ ████████ ████████ ████████ ████████ ████████ ████████ ████████ ████████ ████████ ██ ████████████ *Id.* Mr. Joffe then states, "[i]n advance of the filing of that complaint, I am authorized by Ms. Youngblood-West to make a settlement demand for ████ ████████ . . . to achieve an amicable resolution of this matter, if consummated within ten days from the date of this letter." *Id.* at 6-7.

Aflac's counsel responded to Mr. Joffe's demand on March 23, 2018 on behalf of Aflac and Dan Amos. Mot. for Sanctions Ex. B, Letter from Mary Gill to Dimitry Joffe 1 (Mar. 16, 2018), ECF No. 21-3, *Youngblood-West v. Amos*, No. 4:18-CV-83 (M.D. Ga. Filed May 1, 2018). The response began by describing Mr. Joffe's allegations as "baseless and defamatory" with "no factual or legal basis whatsoever to support these allegations as they relate to Aflac and/or Mr. Amos." *Id.* Counsel for Aflac and Dan Amos explained that ████ ████ ████ █ ████████ ████████ ████████ ████████ ████ ████ ████████ ████ ████ ██ ████████ ████████ ████ ████ ██ █ ████ ████████ ████████ ██ Counsel further

informed Mr. Joffe that neither Aflac nor Dan Amos had any knowledge of Ms. Youngblood-West's allegations, and neither of them participated in any settlement of her claims. *Id.* The letter put Mr. Joffe on notice that "[t]here is no good faith basis to proceed with these claims [against Aflac and/or Dan Amos] ████

████ ████ ████ ████ ████ ████ ████ ████

████ ████ ████ ████ ████ ████ ████ ████

*Id.* The response ends with "Suffice it to say, Aflac rejects your offer of settlement for these patently false and baseless claims." *Id.* at 2.

Undeterred, Mr. Joffe emailed Aflac's counsel a copy of a draft complaint on Saturday April 14, 2018 at 5:28 P.M., stating "Counsel—this is ready for filing first thing Monday am." Compl. Ex. D, Email from Dimitry Joffe to Jim Grant (Apr. 14, 2018), ECF No. 2-4, *Amos v. Youngblood-West*, No. 4:18-CV-68 (M.D. Ga. Filed Apr. 16, 2018). Mr. Joffe included a cryptic post script: "I would quote Matthew 5:25 but your clients should know it by heart."[4] *Id.*

Mr. Joffe sent a follow-up email to counsel the next day, Sunday, April 15, at 12:13 P.M. Compl. Ex. F, Email from Dimitry Joffe to Jim Grant (Apr. 15, 2018), ECF No. 2-6, *Amos*, No. 4:18-

---

[4] According to the Gospel of Matthew, Jesus reportedly said, "[a]gree with thine adversary quickly, whiles thou art in the way with him; lest at any time the adversary deliver thee to the judge, and the judge deliver thee to the officer, and thou be cast into prison." Matthew 5:25 (King James).

CV-68.  In that email, he stated, "Counsel—I may not be able to check my emails for the rest of today but you can always reach me on my mobile [phone].  Your clients have 12 hours left to decide whether they wish to have this dispute resolved in court." *Id.* Thus, Mr. Joffe threatened to file the lawsuit electronically some time after midnight and before the Court opened for regular hours on Monday morning.

Dr. Amos retained different counsel than Aflac.  That counsel determined that Mr. Joffe's correspondence to Aflac's counsel violated the nondisclosure agreements executed by Ms. Youngblood-West over 25 years earlier.  To prevent the disclosure of confidential information covered by those agreements, Dr. Amos's counsel filed a Verified Complaint and Emergency Ex Parte Motion for Temporary Restraining Order to prevent Youngblood-West from filing the complaint on the public docket and to prevent any dissemination of the information that was the subject of the prior settlement/nondisclosure agreements. *Amos v. Youngblood-West*, No. 4:18-CV-68 (M.D. Ga. Filed Apr. 16, 2018)(hereinafter "Dr. Amos Nondisclosure Agreement Action").  Given the urgency of the situation, counsel for Dr. Amos contacted the undersigned at home late on Sunday evening of April 15th to advise the undersigned of its action and the short time period the Court had to grant a temporary restraining order given Mr. Joffe's threat to file his complaint shortly after midnight.  Rather than decide the matter

17

*ex parte*, the undersigned recalls having counsel for Dr. Amos contact Mr. Joffe so that a conference call could be scheduled that evening. To the best of the undersigned's recollection, a short conference call was held with Mr. Joffe and Dr. Amos's counsel in which the undersigned advised them that he would hold a hearing the next morning where Mr. Joffe and Dr. Amos's counsel could be heard. After hearing from both sides the next morning, the Court issued a preliminary injunction against Plaintiff and Mr. Joffe. That order was subsequently memorialized in writing. Order, *Amos*, No. 4:18-CV-68, ECF No. 3. It restrained Mr. Joffe and Ms. Youngblood-West as follows:

> A. [Ms. Youngblood-West], and any person acting on her behalf or in concert with her (including her current counsel), shall file under seal any document that relates to the subject matter of the draft ████ ████ ████████, including, without limitation, the draft ████ ████████████ any complaint similar to it, and any corresponding exhibits;[5]
>
> B. [Ms. Youngblood-West], and any person acting on her behalf or in concert with her (including her current counsel), shall not disseminate, disclose, or discuss publicly the subject matter of the draft ████ ████████ or any other documents sealed and restricted by this Court, except that ████████████████████ ████ ██████████ ██████ ██████ ████ ████████ ██████████████████ and [Ms. Youngblood-West] is not prohibited from discussing these matters with her current counsel;

---

[5] "Under seal," as used in this Order, meant that the filing must not be available to the public without prior permission from the Court or the government agency with whom the filing is made.

C. Access to [Dr. Amos's] Verified Complaint (including the Exhibits), [Dr. Amos's] Emergency Ex Parte Motion for a Temporary Restraining Order, and any further filings in this action shall be restricted such that the filings are only accessible by the parties to this action, their counsel of record, and court personnel.

*Id.* at 3-4. Mr. Joffe subsequently filed his complaint under seal in this Court on May 1, 2018. *See* Compl., *Youngblood-West v. Amos*, No. 4:18-CV-83 (M.D. Ga. filed May 1, 2018), ECF No. 1 (hereinafter "Youngblood-West Action" or "present action"). And he filed a motion to dismiss Dr. Amos's nondisclosure agreement action in case number 4:18-CV-68. Def.'s Mot. to Dismiss, *Amos*, No. 4:18-CV-68, ECF No. 15. In an order dated August 7, 2018, the Court denied that motion to dismiss, finding that the settlement agreements were valid contracts that contained enforceable confidentiality provisions. Order, *Amos*, No. 4:18-CV-68, ECF No. 19. In that order, the Court also stated the following:

Having decided today that the agreements are enforceable as alleged, the Court finds that a strong interest exists in honoring the parties' confidentiality agreements by restricting public access to these proceedings. The Court further finds, notwithstanding that interest, that there is a strong public interest in public access to judicial proceedings, particularly orders of the Court. Balancing these competing interests, the Court directs that this case be unsealed such that the existence of this action, the identities of the parties, and today's Order by the Court shall be shown on the public docket. However, until further order of the Court, all previous and future filings in this action shall be maintained and filed in a restricted manner such that they are accessible only by the parties, their counsel, and appropriate court personnel.

*Id.* at 15 n.5. The day after that order was entered, the Court entered a show cause order directing the parties in Dr. Amos's nondisclosure agreement action and in the Youngblood-West action to show cause as to whether filings in these two cases should remain restricted from public access. Order, *Amos*, No. 4:18-CV-68, ECF No. 20; Order, *Youngblood-West*, No. 4:18-CV-83, ECF No. 37.

Shortly after the cases were partially unsealed, counsel contacted the Clerk's Office and informed administrative personnel that Dr. Amos intended to file a motion for reconsideration regarding the Court's partial unsealing of the cases and thus requested that the case be re-sealed until that motion could be filed. The following remark by a docket clerk is indicated on the docket: "[i]n light of recent telephonic inquiries and in anticipation of motions for reconsideration/clarification, the cases are remaining sealed pending further Order of the Court." Docket Remark, *Amos*, No. 4:18-CV-68. On that same day, Dr. Amos's counsel filed an "Emergency Motion for Reconsideration." Mot. for Recons., *Amos*, No. 4:18-CV-68, ECF No. 21. In that motion, counsel sought to be heard on whether the filings should remain sealed, and if not, the extent to which they should be unsealed. *Id.* at 2.

Two days later, the Court granted in part and denied in part the motion for reconsideration. Order, *Amos*, No. 4:18-CV-68, ECF

No. 23; Order, *Youngblood-West*, No. 4:18-CV-83, ECF No. 40. Specifically, the Court stated "[t]he Court orders that these actions shall be partially unsealed, until the parties have had an opportunity to respond to the Court's previously issued show cause order and the Court can determine whether the remainder should be unsealed." *Id.* at 2. The Court directed that the existence of the actions and the case numbers shall appear on the public docket, but the names of the parties shall be shown as "Sealed v. Sealed." *Id.* The Court further ordered that the following documents would be accessible to the public until further order of the Court: (1) a redacted copy of the Court's show cause order; (2) an unredacted copy of the Court's order granting in part and denying in part the motion for reconsideration and partially unsealing the action; and (3) a redacted copy of the order denying Youngblood-West's motion to dismiss in case number 4:18-CV-68. *Id.* at 2-3.

The Court eventually consolidated Dr. Amos's nondisclosure agreement action, case number 4:18-CV-68, with the Youngblood-West action, case number 4:18-CV-83, on September 6, 2018, over Mr. Joffe's objection. Order, *Youngblood-West*, No. 4:18-CV-83, ECF No. 57. Dr. Amos's nondisclosure agreement claims were treated as counterclaims in the Youngblood-West action. After receiving briefing from the parties, the Court entered an order on September 7, 2018 addressing the issue of whether and to what extent filings should remain sealed. Order, *Youngblood-West*, No. 4:18-CV-83, ECF

No. 59.  The Court established a redaction protocol in that order. *Id*.

In the Youngblood-West action, Mr. Joffe alleges on behalf of his client that ███████████████████████████████████ ████████ ██████████ █████████ ██ █ ███ ████████ █████ ████ ████ █████ ████ ███████████████████████ ████ ███████████████. He also alleges certain related ████ ███████.  Am. Compl. ¶ 1, *Youngblood-West*, No. 4:18-CV-83, ECF No. 26.  Defendants seek dismissal of Plaintiff's complaint because it fails to state a plausible claim for relief against any of the Defendants, the claims are barred by the statute of limitations, and the claims against Dr. Amos and Cheves have been released. Mots. to Dismiss, *Youngblood-West*, No. 4:18-CV-83, ECF Nos. 32-34.  Those motions are presently ripe for consideration by the Court.  Defendant Oates had not been served with the Complaint at the time the other Defendants filed their motions to dismiss.

After all of the briefing had been completed on the motions to dismiss and the Court had spent considerable time reviewing them, Mr. Joffe filed the current motion to recuse the undersigned on September 21, 2018.  Mot. for Recusal, *Youngblood-West*, No. 4:18-CV-83, ECF No. 69.  The Court must decide the motion to recuse before deciding the motions to dismiss.

DISCUSSION

With this background in mind, the Court addresses the Plaintiff's recusal accusations.

## *"Fish House Gang" Affiliation*

Plaintiff states in her affidavit that the Amos and Land families are among "the founders and prominent members of the so-called Fish House Gang—a secretive, exclusive, 'by invitation only,' highly coveted 'singular opportunity to network' for the powerful members of the Georgia establishment." Pl.'s Aff. ¶ 17. In support of this conclusory statement, she cites to newspaper articles and other published writings. *Id.* at ¶¶ 17-26. Those writings focus upon the undersigned's great-uncle, John Land, who was a Superior Court Judge for the Chattahoochee Judicial Circuit and considered by many to be the leader of the Fish House Gang. *Id.* Plaintiff's affidavit also quotes an excerpt from a publication on Aflac co-founder John Amos that states that John Amos "founded" the Fish House Gang. *Id.* at ¶ 20. The only mention of the undersigned in any of the articles is that the undersigned attended some of the Fish House Gang meetings. *Id.* at ¶ 21.

The articles are a fascinating and nostalgic look at a powerful Superior Court Judge from a prior era. But that judge has been dead for seven years; and he had been retired for twenty-

three years when he died at the age of 93.[6] *See id.* at 24 (citing a 2011 article entitled "Powerful Judge John Henry Land Dies at Age 93"). The undersigned does not deny that his great-uncle John had a personal friendship with John Amos, one of the Aflac founders. But John Amos died in 1990 at the age of sixty-six.[7] While the articles cited in Plaintiff's affidavit fuel Plaintiff's speculation that a close connection existed between John Land, John Amos, and the Fish House Gang, those affiliations ended in 1990 upon the death of John Amos. And John Land's affiliation with the Fish House Gang would have ended no later than his death in 2011.

The present question is whether the *undersigned's* affiliation with the *modern* version of the Fish House Gang (seven years after his great-uncle's affiliation ceased and twenty-eight years after John Amos's affiliation ceased) would cause a reasonable person to believe that the undersigned could not be impartial in an action involving Aflac, Dan Amos, William Amos, Cecil Cheves, and Samuel Oates. In an order dismissing Mr. Joffe's

---

[6] John Land died on November 30, 2011 at the age of 93. He served as a Superior Court judge for the Chattahoochee Judicial Circuit from 1964 to January 1, 1989 when he retired. He was the brother of the undersigned's grandfather.

[7] *See* Laura McCarty, *John Amos (1924-1990)*, New Georgia Encyclopedia (Mar. 10, 2006), https://www.georgiaencyclopedia.org/articles/business-economy/john-amos-1924-1990.

shareholder derivative action, the undersigned described the modern Fish House Gang as follows:

> This group actually includes approximately two-hundred invitees who gather three or four times a year to enjoy fried fish, french fries, hushpuppies, coleslaw, and each other's company. The undersigned has been invited to these functions over the years and has attended with some regularity. The group conducts no official business, charges no membership fees, and has no stated organizational purpose. The attendees pay for the cost of their own meals.

*Conroy v. Amos*, No. 4:18-CV-33, 2018 WL 4208855, at *1 (M.D. Ga. Aug. 31, 2018). Plaintiff and her counsel imply that Dan Amos, William Amos, and/or Cecil Cheves also attend Fish House Gang functions. According to the undersigned's review of the most recent invitee list, none of them are on the list. Although they may have attended one or more of these fried-fish suppers in the past, the undersigned has no specific recollection of them having done so.[8]

The applicable recusal standards do not require disqualification based upon the undersigned's attendance at these fish suppers. The test under section 455(a) is "whether an objective, disinterested, lay observer" knowing the grounds on which recusal is sought "would entertain a significant doubt about the judge's impartiality." *Parker v. Connors Steel Co.*, 855 F.2d

---

[8] Defendant Samuel Oates does appear on the recent invitee list, but the undersigned has no specific recollection of his recent attendance.

1510, 1524 (11th Cir. 1988).  As noted, the undersigned does not have any recollection of the Amos Defendants or Defendant Cheves even attending these events, and their names do not appear on the recent invitee list.

But even if they did attend these suppers, the undersigned's attendance would not warrant disqualification in this action. Attendance at social events that a party to litigation may have also attended does not create the appearance of partiality or bias and is not a legitimate basis for recusal.  *See Parrish v. Bd. of Comm'rs of Ala. State Bar*, 524 F.2d 98, 101, 104 (5th Cir. 1975);[9] Code of Conduct for United States Judges Canon 4 cmt. (Judicial Conference 2014) ("Complete separation of a judge from extrajudicial activities is neither possible nor wise; a judge should not become isolated from the society in which the judge lives.").  Nor does it provide a basis for recusal under §§ 144 or 455(b)(1), which ask whether the undersigned *actually* has a personal bias or prejudice concerning a party.  *United States v. Amedeo*, 487 F.3d 823, 828 (11th Cir. 2007).

Perhaps if John Land and his good friend John Amos were miraculously resurrected and John Land was reincarnated as a United

---

[9] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

States District Court judge and John Amos was a party to this litigation, then *great-uncle* John may should consider recusal. But the undersigned is aware of no principle of law that would result in the undersigned inheriting his great-uncle's alleged bias in favor of John Amos, and then transforming that bias to a bias in favor of John Amos's nephews.

Mr. Joffe's Fish House Gang allegations may make for a colorful tale about old-fashioned politics in a by-gone era, but they are frivolous insofar as he relies upon them as a basis for the undersigned's disqualification.

### *Family Relationships*

In her affidavit, Plaintiff states generally that the undersigned has family ties with the Amos Defendants. She makes no *specific* allegations as to what those ties are and only identifies Aflac employee William Donald Land, Jr. as a disqualifying relative. The undersigned does not believe that he has ever met William Donald Land, Jr. and first learned of his employment at Aflac when it was brought to his attention by Mr. Joffe in this litigation. Upon learning of his alleged involvement in this action as an employee in the Aflac legal department, the undersigned consulted with the Land family genealogist and has learned that William Donald Land, Jr. is the undersigned's fourth cousin, once removed. According to the undersigned's

calculations, this places William Donald Land, Jr. at the 11th degree of relationship to the undersigned.

A judge must recuse when "a person within the *third degree* of relationship" to the judge is or could be involved in a proceeding in certain ways or has "an interest that could be substantially affected by the outcome of the proceeding." 28 U.S.C. § 455(b)(5). Even if William Donald Land, Jr. is somehow involved in these proceedings, his degree of relationship to the undersigned is a distant eight degrees beyond the prohibited boundary. That diluted blood line combined with the undersigned's personal unfamiliarity with his distant relative makes him more stranger than "kissing cousin."[10] The undersigned is also unaware of any other relative who is within the prohibited degree of relationship and involved in these proceedings or who has an interest that could be substantially affected by the outcome.

*Spouse's Employment With*
*Page, Scrantom, Harris & Chapman, P.C.*

In her affidavit, Plaintiff alleges that the undersigned's wife was a partner in the Page, Scrantom, Harris & Chapman, P.C. law firm at the time that Plaintiff signed the two releases that

---

[10] "Kissing Cousin" has been defined as "a person and especially a relative whom one knows well enough to kiss more or less formally upon meeting." *Kissing Cousin Definition*, Merriam-Webster Dictionary, *available at* www.merriam-webster.com/dictionary/kissing%20cousin.

Defendants Dr. Amos and Cheves rely upon in part in their pending motions to dismiss this action. One of these releases includes Page, Scrantom, Harris & Chapman, P.C. ("Page Scrantom") and all of its shareholders, officers, and employees as releasees. Mr. Joffe, therefore, maintains that the undersigned's wife, as a former employee and shareholder of Page Scrantom at the time the releases were executed, has a *substantial* interest in how the Court rules on the enforceability of those releases. The interest of the undersigned's wife in the outcome of that issue, or any other issue in these proceedings, is not simply insubstantial and remote— it is nonexistent. Mr. Joffe's suggestion otherwise is misleading.

Plaintiff specifically released Cecil Cheves, William Amos, Samuel Oates, and Page Scrantom. *See* Am. Compl. Ex. C, 1993 Settlement Agreement 1, ECF No. 26-3. The general release also included language releasing any employee or shareholder of Page Scrantom. *Id.* But Plaintiff has made no allegation that the undersigned's spouse had anything to do with the conduct giving rise to the claims that were released. She was simply released incidentally along with every other employee of the firm at the time, whether they knew anything about the matter or not.

Presumably, Mr. Joffe contends that although the undersigned's wife left Page Scrantom around 1994, she somehow presently has a substantial interest that could be affected by the

outcome of these proceedings due to her being an incidental releasee. Mr. Joffe carelessly alleges that the undersigned's wife was a "partner" in Page Scrantom based upon her name appearing among the list of lawyers on Page Scrantom letterhead from that era. But that same letterhead that Mr. Joffe relies on clearly indicates that Page Scrantom was a *professional corporation*, not a general partnership. Pl.'s Mot. for Recusal Ex. A., Letter from Page Scrantom (Sept. 29, 1992), ECF No. 69-1; Pl.'s Mot. for Recusal Ex. B, Letter from Page Scrantom (Mar. 16, 1993), ECF No. 69-2. Thus, the letterhead shows only that the undersigned's wife may have been a *shareholder* in the Page Scrantom professional corporation.

While lawyers who are shareholders in professional corporations sometimes refer to their fellow lawyer shareholders casually as "partners," a significant legal difference exists between a *shareholder* lawyer in a professional corporation and a *partner* in a general partnership. Under Georgia law, a shareholder in a law firm professional corporation is not legally liable for the conduct of other fellow lawyers/shareholders in the professional corporation. *See Henderson v. HSI Fin. Servs., Inc.,* 471 S.E.2d 885, 886-87 (Ga. 1996)(holding that shareholders in a professional corporation law firm were not liable for the professional misconduct of a fellow lawyer shareholder). Therefore, even if the release that included Page Scrantom, its

shareholders, and employees was held to be unenforceable, such a ruling would have no legal or practical impact on the undersigned's wife, an incidental releasee. She is not alleged to have engaged in any conduct involving the plaintiff that would subject her to personal liability. And, under Georgia law, she could face no liability for the conduct of then fellow-shareholder Cheves or any of the other lawyers ████████ ██ ██ ██████ ████████. Furthermore, since she left the firm in 1994, she has no present shareholder interest in the Page Scrantom professional corporation, and thus has no capital contribution at risk.[11] The undersigned's spouse simply has no interest that could be affected by these proceedings. No reasonable person could conclude otherwise. And had Mr. Joffe exercised slight diligence before having his client execute a misleading affidavit, he would have reached the same conclusion.

*Allegations of Actual Bias*

Mr. Joffe makes several allegations of "actual personal bias." Most of those accusations relate directly to rulings that the Court has made in this litigation and thus cannot support a personal bias claim. *See Liteky v. United States,* 510 U.S. 540, 555 (1994); *see also Parrish v. Bd. of Comm'rs of Ala. State Bar,*

---

[11] The Court notes that neither Page Scrantom, nor any of its shareholders or employees, except former shareholder and employee Cheves, has been named as a party in the present litigation.

524 F.2d 98, 100 (5th Cir. 1975) (en banc). Therefore, the undersigned does not address them here. But Mr. Joffe also makes baseless and misleading accusations of improper *ex parte* communications, and those allegations cannot be left unanswered.

Mr. Joffe seeks to cast a cloud over the undersigned's impartiality by spinning entirely appropriate conduct as suspicious *ex parte* communications. These accusations are preposterous, and Mr. Joffe should have known better before he recklessly included them in his client's affidavit. First, he points to the initiation of this litigation when the undersigned was contacted by telephone at home late on a Sunday evening by a desperate lawyer representing Dr. Amos who obviously did not want to disturb a federal judge at home, much less late on a Sunday evening. Dr. Amos's counsel was faced with the threat from Mr. Joffe that sometime after midnight and before the Court opened officially for business Monday morning, Mr. Joffe was going to file electronically a complaint on the public docket that included allegations covered by a nondisclosure agreement signed by Mr. Joffe's client over 25 years ago. Counsel for Dr. Amos certainly had a good faith basis for seeking an *ex parte* temporary restraining order. Mr. Joffe should be aware that such *ex parte* temporary restraining orders are authorized by clearly established law. *See* Fed. R. Civ. P. 65(b) ("The court may issue a temporary restraining order *without written or oral notice to the adverse*

*party or its attorney . . .*" (emphasis added)).  No reasonable member of the bar would have a good faith belief that Dr. Amos's counsel's attempt to seek a temporary restraining order was an improper *ex parte* communication.

Moreover, the events following Dr. Amos's counsel's contact further demonstrate the frivolous nature of Mr. Joffe's accusation.  Rather than decide the motion *ex parte*, as the undersigned could have done consistent with applicable law, the undersigned insisted that Dr. Amos's counsel get Mr. Joffe on the line that night.  The undersigned then held a telephone conference from his home late Sunday evening with both Dr. Amos's counsel and Mr. Joffe.  The Court informed them that they both would be heard first thing the next morning.  That Monday morning, the Court held a hearing.  After hearing from both sides, the Court entered a preliminary injunction directing that Mr. Joffe file his complaint under seal instead of on the public docket.  Suggesting that anything about this process amounted to inappropriate *ex parte* communication is frivolous and misleading.

Mr. Joffe's other allegation of improper *ex parte* communication is similarly groundless.  Mr. Joffe accuses Defendants' counsel of making improper *ex parte* contacts with the Court when counsel made telephonic inquiries of court personnel. In support of this accusation, Mr. Joffe relies upon the following

remark by a docketing clerk: "REMARK: In light of recent telephonic inquiries and in anticipation of motions for reconsideration/clarification, the cases are remaining sealed pending further Order of the Court." Docket Remark, *Amos*, No. 4:18-CV-68. The entry includes the initials of the docket clerk who made the entry. *Id.*

Mr. Joffe first suggests that this entry was suspiciously deleted from the docket. This suggestion is simply false. It appears on the docket today. But since it was an internal administrative entry by a docket clerk, it is only accessible to court personnel consistent with the policies and procedures of the clerk of court. The docket does note, however, that when the entry was made by the docket clerk, it was served upon counsel for the parties, including Mr. Joffe. Any suggestion that court personnel tried to hide the information contained in the docket clerk's remark or improperly deleted a docket entry is false and misleading.

As to the suggestion that the re-sealing of the case was somehow improper, Mr. Joffe again resorts to a misleading interpretation of what actually happened. The Court issued an order partially unsealing the case at approximately 5:00 P.M. on August 7, 2018. The next morning, while the undersigned was in Montgomery, Alabama holding court as a visiting judge, counsel for

Dr. Amos contacted the clerk's office notifying the docket clerk that they intended to file a motion for reconsideration regarding the partial unsealing and requesting that the case remain under seal until their motion for reconsideration could be heard. The docket clerk promptly re-sealed the cases administratively. Shortly after that was done, Dr. Amos's counsel sent the following email to the undersigned's courtroom deputy clerk, which he also sent to Mr. Joffe: "Dear Ms. Long—I represent plaintiff. Last evening, I received the Court's order denying defendant's motion to dismiss and partially unsealing the record in this case. I understand the case was re-sealed this morning. We would like to schedule a conference call with the Court and opposing counsel to discuss this issue this afternoon. We respectfully ask that plaintiff be heard before any portion of this case is unsealed. If necessary, we will file an emergency motion for reconsideration this afternoon with the Court." The undersigned subsequently decided the motion for reconsideration after hearing from both sides. There was no *ex parte* contact with the undersigned about the merits of the motion for reconsideration or any other substantive issues in the case. The status quo was simply maintained administratively until the Court could hear from both sides on the motion for reconsideration. Mr. Joffe should know that this conduct does not amount to improper *ex parte*

communication.  It is certainly not evidence of personal bias on the part of the undersigned.

The remaining claims in Plaintiff's affidavit are either based upon the undersigned's judicial rulings, writing style, or alleged delay in issuing certain rulings.  None of that conduct supports a claim of actual personal bias.

CONCLUSION

Accusations of bias and lack of impartiality must be taken seriously, which is why the undersigned has filled so many pages to thoroughly address Plaintiff's charges.  But as this Order makes abundantly clear, the accusations here do not withstand minimal scrutiny.  Most are frivolous and many are just plain misleading.

It is human nature to blame others when we do not get what we want.  The undersigned understands Plaintiff's frustration.  ███ ████████████████████████████████ And her lawyer has apparently given her some hope that thirty-four years later she will be heard, her rights will be vindicated, and she will be generously compensated.  When a judge approaches her case like other cases, in a methodical manner without the expression of personal sympathy, a lay party could predictably react with disappointment and even anger.  But members of the bar like Mr. Joffe are held to a higher standard.  Lashing out with reckless and frivolous accusations of judicial bias does not meet that standard.

No legitimate reason exists for the undersigned to abandon his post in this litigation. As has been noted in this Circuit and others, "there is as much obligation for a judge not to recuse when there is no occasion for him to do so as there is for him to do so when there is." *Carter v. W. Publ'g Co.*, No. 99-11959-EE, 1999 WL 994997, at *2 (11th Cir. Nov. 1, 1999) (Tjoflat, J., addendum to pro forma order denying recusal motion) (alteration in original) (quoting *Hinman v. Rogers*, 831 F.2d 937, 939 (10th Cir. 1987)). Recusal under the circumstances presented here would be a dereliction of duty. Plaintiff's motion (ECF No. 69) is denied.

This 5th day of October, 2018

S/Clay D. Land
CLAY D. LAND
CHIEF U.S. DISTRICT JUDGE
MIDDLE DISTRICT OF GEORGIA